HARRISON'S ADMINISTRATRIX *vs.* JOHNSON and others.*

1. The evidence of a defendant who has no interest in the event of the suit, and is unnecessarily made a party, is competent, though the complainant sue in a representative capacity.

2. When the owner of property produces a mortgage made by him upon that property, with the seals torn off, and gives it to a party about purchasing the property, stating that it was paid and satisfied, and that he could take it and have it canceled of record, the fact that the mortgage has no receipt of payment endorsed upon it, and that the bond is not produced, is not sufficient to put the purchaser upon further inquiry.

3. The fact that there is no receipt by the mortgagee or his executors, &c., upon a mortgage presented to the clerk for cancellation, does not make its cancellation illegal, though such cancellation is not *conclusive* evidence of its payment. Its production with the seals torn off, is sufficient authority to the clerk where there is nothing to arouse his suspicions.

4. A mortgage, canceled upon the record, will not be revived against a *bona fide* purchaser of the property, for full value, and without notice in law or in fact, that it was a subsisting encumbrance at the time he purchased.

5. The cases examined and commented upon.

---

* CITED *in Dudley* v. *Bergen*, 8 *C. E. Gr.* 400.

This cause was argued before James Wilson, esq., one of the masters of the court, who was called by the Chancellor to hear the same.

*Mr. P. Bentley* and *Mr. I. W. Scudder*, for complainant.

*Mr. J. P. Jackson, Mr. A. S. Hubbell,* and *Mr. J. P. Bradley,* for defendants.

THE MASTER.

By an agreement in writing, dated fifth of March, 1850, Thomas P. Johnson, one of the defendants, agreed to sell to Joseph Harrison seven eighths of certain lots of land in Newark, for $2848 ; the deed to be delivered on or before the first of May, in the same year ; the sum of $37.50 to be paid on the delivery of the deed, and the residue to be secured by a mortgage upon those lots, and also upon certain other land, which, by an agreement of the same date, said Harrison agreed to sell to said Johnson. By the agreement first mentioned, Harrison also agreed that he would endeavor to get the title to the remaining one eighth of said lots, as soon as he could lawfully do so.

The deed was not delivered within the time so agreed on. But afterwards, by a deed dated twenty-first of November, 1853, said Joseph Harrison, together with James and George Harrison, conveyed to Johnson seven eighths of said lots; and Johnson thereupon executed to Joseph Harrison a bond of the same date, for $4500 ; and, in order to secure it, executed a mortgage to said Joseph upon a part of the property so conveyed. This mortgage is of the same date as the deed, and was, on sixth December, 1853, acknowleged, and left in the clerk's office to be recorded. On the same day, another agreement in writing was made between said Joseph Harrison and said Johnson, whereby, after referring to the agreement first above mentioned, and after reciting that said Harrison had not yet perfected the title to said one eighth of the property, either in himself or Johnson, and

that said deed had been executed for seven eigths thereof to Johnson, and that he had paid, and secured to be paid, the consideration money for the whole of the property, and that Joseph Harrison desired Johnson to pay the whole of said purchase money to him, for his own use, and that of said James and George, it was agreed by said Joseph, that he would save harmless, and idemnify Johnson from all loss, damage, cost, and expense that he might be put to, by reason of said Joseph not procuring a good title to Johnson, for said one eighth, and from any damage, injury, expense, or loss which Johnson might be put to by reason of any improvements he might put thereon; and that he, Joseph, would, at his own cost and expense, within two years from that date, procure for said Johnson a good title to the whole of the lots mentioned in said deed. At the foot of this last agreement is another agreement, signed by Johnson, to the effect, that if Harrison did not make a good title within two years, he should refund to Johnson $356, with interest from first of February, 1850, as liquidated damages.

Johnson took possession of said lots, and made extensive improvements on them, at an expense of about $10,000. He afterwards mortgaged them to Mrs. Woodruff for $10,000, and her mortgage was duly recorded. After this, he agreed to sell the property to Joseph F. Rusling, for $17,000. Before Rusling obtained his deed for the property, he agreed to sell it to the New Jersey Railroad and Transportation Company, and A. S. Hubbell, esq., assisted in examining the title papers, as counsel for Mr. Rusling and the company. Mr. Hubbell searched the record of mortgages in the county clerk's office, in order to ascertain what encumbrances there were upon the property. He there found the record of the mortgage above mentioned, given by Johnson to Harrison. After this, and early in March, 1857, (Mr. Hubbell says it was from the fifth to the seventh, and his impression is that it was on the sixth,) the parties met at the house of Mr. Johnson, who was, at the time, an invalid, and unable to go out, and could speak but little, and only in a whisper.

There were then present, Mr. Johnson, and Mr. Grover, his counsel, Mr. Rusling, and Mr. Hubbell. The mortgage which Johnson had given to Harrison, and which, in his search, Mr. Hubbell had found upon record, was then spoken of; Johnson then produced it, with the seals torn off, and handed it to Rusling, and both Johnson and Grover stated that it had been paid and satisfied. Mr. Hubbell also examined it, and was also told by Johnson and Grover that it was all right, and that he might take it to the clerk's office and have it canceled and discharged of record. Mr. Hubbell, thereupon, advised Mr. Rusling that he might safely take the deed and pay for the property, according to the agreement of purchase. Rusling, accordingly, accepted the deed from Johnson, and paid him $4500 of the purchase money, and executed to him a mortgage for $2500, payable when the title to the one eighth should be perfected. Rusling bought, subject to the mortgage for $10,000, given to Mrs. Woodruff. The deed so given by Johnson to Rusling, contains a covenant of warranty of title, and other covenants. Mr. Rusling and Mr. Hubbell then went, on the same day, to the clerk's office, and produced to him the mortgage, with the seals torn off, and, at their request, the clerk canceled it of record. At the same time, Mr. Rusling left the deed with the clerk to be recorded. Mr. Rusling conveyed the property to the company for $17,000, by deed dated sixth of March, 1857, which was recorded the next day. This deed is a deed of quit claim, without covenant of warranty of title. The company at once took possession of the property, and have held it ever since, and have made valuable improvements upon it. Mr. Rusling and Mr. Hubbell both testify that they had no suspicion at the time, but that the mortgage from Johnson to Harrison had been fully paid and satisfied.

On the twenty-fifth of April, 1857, Johnson executed an assignment of the $2500 mortgage, so given to him by Rusling, to the complainant, and caused the assignment to be recorded; but the complainant, in his bill, charges, that this was done

without his knowledge or consent, and says that he is willing to cancel that mortgage of record, upon receiving payment of the $4500 mortgage, given by Johnson to Joseph Harrison.

The bill in this cause was filed September third, 1861, by James Harrison, as executor of said Joseph Harrison, who died in February, 1855; and said James, having died after this suit was commenced, it was revived in the name of Mary Harrison, as administratix. The bill seeks to have the mortgage given by Johnson to Harrison, and which was canceled as above stated, foreclosed; and the mortgaged premises, which are now owned by the railroad company, sold to satisfy the debt, deducting, however, the said sum of $356, with interest. It charges that the bond, which the mortgage was given to secure, has never been paid, and that the whole amount of principal and interest is due; that the mortgage which had been left in the clerk's office to be recorded, remained there until the second of April, 1856, when the clerk, without authority or right, delivered it to Johnson, who kept it in his possession until the sixth of March following, when he gave it up to Mr. Hubbell, to be canceled of record; that such cancellation of record was illegal, and of no effect, as against the complainant, and that Rusling and the company have no right to claim any exemption from the force and effect of the mortgage. The complainant tenders himself ready and willing to execute to the railroad company, a good title to the said one eighth of the property, which he says he is now able to do.

The company, by their answer, admit the execution of the mortgage so executed by Johnson to Harrison. They say that they purchased the property in good faith, and for a full consideration, which they have paid; that they believed at the time, that the mortgage had been fully paid and satisfied; that they caused the record of mortgages to be examined, and there found this mortgage uncanceled of record, but that, at the time of the delivery of the deed by Johnson to Rusling, (of whom, by previous arrangement, they had agreed to buy the property when he got it of Johnson,) he, Johnson, pro-

duced the mortgage with the seals torn off, stating, at the same time, that it was paid and satisfied, and that he then gave it up to be canceled of record; that Rusling believed Johnson, and accepted the deed from him, and paid the consideration as agreed on, in the full belief that the mortgage was satisfied, and that Mr. Hubbell, (whom the company say was acting for them as well as for Rusling,) acted under the same belief; that in making their purchase, the company used all reasonable care and diligence to ascertain the condition of the property as to title and encumbrances; and that, having done so, and given full value for it, the mortgage ought not now be declared to be a lien upon the property.

The defendant, Johnson, was examined as a witness on the part of the company, under an order of the court for that purpose, subject, however, to all just exceptions. And upon the hearing, his testimony was objected to, upon the ground that he was an incompetent witness; that, being a defendant, he could not, it was insisted, be a witness, because the complainant is suing in a representative capacity, and that, under the act of the eighteenth of March, 1859, (*Nix. Dig.* 928,*) a party in a suit cannot be sworn as a witness, when the opposite party is prohibited by any legal disability, from being sworn as a witness, or either party sues or is sued, in a representative capacity. Johnson had parted with all his interest in the mortgaged premises, by the conveyance to Rusling, long before this suit was brought. He has no interest in the event of this suit. He is not a necessary party. *Vreeland* v. *Loubat,* 1 *Green's C. R.* 104. If he had not been made a defendant, there would be no objection to his competency. The complainant cannot, by making him a defendant, when he is not a necessary party, deprive the other defendants of the benefit of his testimony. Before the statute just referred to was enacted, it was according to the practice of this court; to permit a defendant to examine his co-defendant, upon an allegation that he was not interested in the event of the suit, or in the matter upon which he was to be examined; saving, however, all just exceptions. *Murray* v. *Shadwell,* 2 *Ves. &*

.B. 401; *Kirk* v. *Hodgson*, 2 *Johns. C. R.* 550; *Neville* v. *Demeritt*, 1 *Green's C. R.* 333. In such case, an objection to his testimony might be raised at the hearing, and if it then appeared that he was interested, it was rejected; otherwise, it was admitted. If this case had occurred before the statute, and Johnson had been examined under such order, his testimony would have been received at the hearing, for he is in no wise interested in the event of the suit. The statute was not designed to affect that rule of practice. If Johnson were interested in the event of the suit, then, as the complainant was suing in a representative capacity, he, Johnson, could not, under the statute, be sworn as a witness. But such is not the case. I receive his testimony, therefore, as that of a competent witness. The same objection was made to the testimony of Mr. Hubbell, who is also made a defendant. For like reasons, I think that he is a competent witness, and receive his testimony accordingly.

It was insisted by the complainant's counsel, that inasmuch as it appeared by a book kept in the clerk's office, called "the tickler," that the mortgage, after it was left there to be recorded, had been delivered by the clerk to Johnson, who was the mortgagor; and inasmuch as it did not appear that there was any receipt of payment endorsed on the mortgage, when Johnson produced it to Rusling and Hubbell with the seals torn off, and delivered it to them to be canceled of record, and he did not produce the bond which the mortgage was intended to secure, that these facts were sufficient to raise in their minds a doubt or suspicion, whether it had been paid or not; and that there was enough to put them upon inquiry, and that they ought to have made inquiry of the mortgagee, or his legal representatives, whether it had in fact been paid or not.

But, according to the evidence, "the tickler" is not one of the public records; not a book authorized or required to be kept by law; but only a private book of the clerk, kept for his own satisfaction and convenience. Hr. Hubbell was not bound to examine it in making his searches touching the

property, and there is no evidence that he did examine it in fact, or that he knew what it contained, or even that he knew that such a book was in existence. I do not think that he can be considered as knowing, or as being bound to inform himself of, what it contained. He searched the registry of mortgages, which the law requires to be kept. He found there an entry of the mortgage in question, standing open and uncanceled. He then went with Rusling to Johnson's house to examine the title papers, preparatory to Rusling's taking his deed; and there Johnson produced the mortgage, with the seals torn off, and gave it to them, stating that it was paid and satisfied, and that they could take it and have it canceled, and discharged of record. If the mortgage had in fact been paid and satisfied, it would naturally and properly, and according to the usual course of such transactions, have been found in the custody of Johnson, who was not only the mortgagor, but still continued to be the owner of the mortgaged premises. And I do not think that the fact that the mortgage had no receipt of payment endorsed upon it, and that the bond was not produced, was one which ought to be taken as sufficient to raise a doubt or suspicion whether it had in fact been paid, in the minds of Mr. Hubbell and Mr. Rusling, or to put them upon further inquiry. There is no rule of law requiring such receipt to be endorsed upon a mortgage, when it is paid or satisfied; and in practice, so far as I am acquainted with it, and as stated by counsel on the argument, as within their own knowledge, a mortgage is often, when fully paid, canceled by tearing off the seals, and is then given up to the mortgagor without any receipt of payment upon it. And it sometimes happens, while the mortgage debt remains unpaid, that the mortgagee does, for the accommodation of the mortgagor, consent to give up the mortgage to him, and to have it canceled; retaining the bond however, as evidence of the debt, and relying upon that alone, or taking some other security in the place of the mortgage. In such case, the mortgage might properly, without any receipt of payment endorsed upon it, be given up to the

mortgagor to be canceled, and to be held by him as evidence that it was no longer a lien upon the premises embraced in it.

It was further urged, that the cancellation of record by the clerk was illegal, because our statute declares that, "when any mortgage, registered as aforesaid, shall be redeemed, paid, and discharged, it shall be the duty of the clerk, on application to him made by the mortgagor or person redeeming, paying, or discharging the said mortgage, and producing to him the said mortgage canceled, or a receipt thereon, signed by the mortgagee or his executors, administrators, or assigns, to enter in a margin, to be left for that purpose opposite to the said abstract, a minute of the said redemption, payment, and discharge, which minute shall be a full and absolute bar to, and discharge of, the said entry, registry, and mortgage." And it is insisted that there was no such receipt of payment endorsed upon the mortgage at the time it was produced to the clerk by Mr. Hubbell, with the seals torn off, and that it had not, in fact, been paid; and that the clerk, therefore, had no right or authority, under the statute, to cancel it of record.

When the mortgage, with the seals so torn off, was produced to the clerk by Mr. Hubbell, he had just before received it in that condition from the hands of the mortgagor, who told him that it was paid, and that he would take it and have it canceled of record. Mr. Hubbell may, therefore, be taken as acting in that matter for the mortgagor; and the clerk, on being satisfied of that fact, might lawfully do with the mortgage the same as if the mortgagor had, in person, and with his own hand, produced it to him, with the seals torn off, and with the request to have it canceled of record. Mr. Johnson had then long been a resident of Newark, was actively engaged in business there, and the owner of a considerable amount of property. Mr. Hubbell was also a resident of Newark, a counselor of high standing in his profession, and often, no doubt, transacting business of that kind at the clerk's office. I think that the clerk did not act illegally, or contrary to the statute, in canceling

the mortgage of record, under the circumstances of this case. Suppose there had been, at the time when the mortgage was so produced to the clerk to be canceled, a full and explicit receipt, declaring that the mortgage had been paid and satisfied, and such receipt purported to be signed by the mortgagee. How would the clerk know that the signature was genuine? Could he go into the taking of proofs upon that question? How is he to call witnesses? What authority has he to examine them? Would he make such inquiry (if he entered upon it,) *ex parte*, and without notice to the mortgagee, and if not, how shall he summon him to appear? I do not think that the statute meant to impose any such duty upon the clerk.

The case of *Miller* v. *Wack et al., Saxt.* 204, related to a mortgage which, it was alleged, the mortgagor, after it had been duly executed, delivered, and recorded, obtained from the mortgagee, upon the pretence that he wanted merely to look at it, and that after he so got it into his hands, he refused to give it up, and having canceled it, took it to the clerk's office and had it canceled of record, while the debt which it was given to secure, remained wholly unpaid.

The counsel who argued that such cancellation of record ought to be declared fraudulent and void, and that the mortgage should be held still to be a lien on the premises, and entitled to the same place in order of priority as if such cancellation had not been made, quoted the above mentioned section of our statute in relation to mortgages. And, referring to their having done so, Chancellor Vroom says: "And then they contend, that the fact of the possession and cancellation of the mortgage is not to be taken as evidence of the legal satisfaction and discharge of the mortgage; that this must be proved by the person who holds the priority on the record, as against him who sets up and claims under such canceled instrument. I do not consider this to be the sound construction of the act; and it appears to me that a more dangerous one could not well be given to it. The clerk acts, and must act, upon the simple production of the mortgage,

with the seals torn off, or the mortgagor's receipt endorsed. He has no judicial power. He is not required to examine witnesses as to the fact of payment; and it is, therefore, true, that the simple cancellation is not an absolute bar, unless there has been actual satisfaction. It is not conclusive evidence. The facts may be inquired into in a proper way."

The Chancellor here is clearly of opinion, that if the clerk acts " upon the simple production of the mortgage, with the seals torn off," he acts legally in canceling the mortgage of record. The clerk did so in the present case. The Chancellor adds, however, that " it is not *conclusive* evidence of payment; that the facts may be investigated in a proper way." In these views I concur. The facts may be so investigated; and when that has been done, and the truth of the case is fully shown, then, what is the law arising upon those facts, and how are the rights of the parties to be affected by them, is next to be considered. That must be done in the present case, and I will presently turn my attention to it. The inquiry now is, was the cancellation of record, which was made by the clerk, upon the production to him of the mortgage with the seals torn off, with a request to have it canceled of record, illegal, because there was not at the time, a receipt of payment endorsed upon the mortgage? I do not think that it was.

It is further alleged by the complainant, that the bond which the mortgage so canceled was given to secure, has never been paid. That allegation is sustained by the proof. It is also alleged, that the mortgage, after it was left at the clerk's office to be recorded, was taken from there by Johnson, without any authority; that he obtained it illegally, and that he caused it to be canceled without the knowledge or consent of the complainant; and that for these reasons, it should be declared to be a valid and subsisting encumbrance upon the mortgaged premises, which, as before stated, are now owned by the railroad company. No witness but Mr. Johnson, speaks of the manner in which he got possession of the mortgage. He says, that after the death of Joseph Harri-

son, the mortgagee, he called on James Harrison, the executor, and told him that it was time that the title to the one eighth of the property was perfected; that Harrison replied, that it should be done; that he had sent to Ireland by a friend to try to have it done, but did not succeed; but that it should be done, though it might take time; that Johnson then told him, that in view of the fact that he, Johnson, had expended a considerable amount in improving the property, he thought that it ought to be done immediately; that Harrison then told him to go to the clerk's office and get the mortgage, and that he could hold it, until the title was perfected; that he, Johnson, then went to the clerk's office and got it, and kept it in his possession until he conveyed the property to Rusling; that while he so held it, he had several interviews with Harrison, who alluded to the mortgage, and asked Johnson to bring it to him, saying, at the same time, that he would be prepared in a very short time to complete the title; to which request Johnson replied, that that was not the understanding on which he got the mortgage, but that it was to be held by him, "as security for the completion of the title." Johnson also testifies, that in some of those interviews, he told Harrison that he, Johnson, wanted to sell the property.

It appears, therefore, that Johnson took the mortgage from the clerk's office, with the consent, and by request of James Harrison, who, as executor of the mortgagee, was then the owner of it; that he so took it, to hold as security until the title should be completed, and that in violation of this understanding, and abusing the confidence thus reposed in him, he canceled the mortgage, by tearing off the seals, and giving it up to Mr. Rusling and Mr. Hubbell, to be canceled of record, at the same time telling them that it had been paid and satisfied; that they were thus deceived and led to believe that the mortgage was paid; that Rusling, under this belief, bought the property, as free from the mortgage, and paid $4500 in cash, and gave a mortgage for $2500 upon the property, to Johnson, to be paid when the title to the one eighth should be completed; and that Rusling

and Hubbell then took the mortgage to the clerk's office, and had it canceled of record. When Rusling received his deed from Johnson, he received, at the same time, that which enabled him to have the mortgage canceled of record, to wit, the mortgage itself, with the seals torn off; and he might, before actually closing the purchase, and taking his deed, have gone to the office, and had the cancellation of record made, and then have returned to Johnson's house, and accepted the deed. I view this case, therefore, as the same in effect, as if the mortgage had been actually canceled of record, before Rusling received his deed from Johnson. I consider, also, the railroad company, who at the time were represented by Mr. Hubbell, as having all the knowledge of the matter which he had, and that they ought, therefore, to have all the benefits, and bear all the burthens, arising from that fact. The company are now the owners of the property, and the question is, shall this mortgage be declared to be an encumbrance upon it in their hands, or shall the complainant be left to collect the bond from Johnson.

If this question affected only the complainant and Johnson, there would be no difficulty in declaring the mortgage, under the circumstances of this case, to be still a valid encumbrance upon the property. If there were mortgages, or other encumbrances upon it, which were taken subsequently to the canceled mortgage, and while it was still in existence and in full force, and with notice, in law or in fact, that it was an existing encumbrance, it would be just and equitable to declare it to be still a lien, and entitled to priority over such subsequent encumbrances, for they were taken with notice of it, and subject to it. But here is a *bona fide* purchaser, who has bought the property for full value, and paid a large sum of money for it. He bought after examining the record of mortgages to ascertain what liens there were upon it. He relied upon the public record, which the law has furnished for his guide. He found there a registry of the mortgage in question; but before he completed his purchase, the mortgage itself was placed in his hands canceled, with informa-

tion that it was paid. It was so given to him, in order that he might have it canceled of record, and he was thus enabled to have it done, and did have it done, immediately after taking his deed. In all he did, he acted under the full belief that the mortgage was paid; and I think that, under the circumstances, he was justified in so believing. He used, as it seems to me, all requisite care and diligence to ascertain the situation of the property, as to encumbrances, and to make his purchase a safe one.

Is it equitable and right, now to revive the mortgage as against such purchaser? He did not, by any act, or any neglect, or want of diligence, contribute to the fraud which Johnson committed against the complainant, by canceling the mortgage. The executor of Harrison himself, placed the mortgage in Johnson's hands, that is, consented that he take it from the clerk's office. He thus put it into the power of Johnson to commit the very fraud which he has committed. Johnson took the mortgage from the clerk's office on the second of April, 1856, and held it until the fifth of March, following, so that he had it in his hands for nearly a year. During all this time, Harrison knowing that Johnson wanted to sell the property, and knowing, also, that while holding the mortgage, Johnson had it in his power to mislead an innocent purchaser, took no steps to compel him to give up the mortgage to him, though he had requested him to give it up, and he refused to do it.

If a fraud has been committed, and a loss must, in consequence, fall upon one of two parties, it ought to be borne by the party whose act or default has contributed to the wrong, rather than by the one who had no share in it, who has taken the public records for his guide, and has paid out his money upon the faith reposed in them; for, as already mentioned, I consider this case in the same light, as if the mortgage in question had been actually canceled of record, before Johnson placed the deed in the hands of Rusling.

I think, therefore, that the mortgage ought not now to be decreed to be an encumbrance upon the property, but that

the complainant should be left to the bond, or to such other remedy as she may have against Johnson, to recover the debt secured by it.

In the case of *The Trenton Banking Co.* v. *Woodruff*, 1 *Green's C. R.* 117, the question was, whether a mortgage which had been fraudulently canceled, should be revived or not. There was a subsequent mortgage; and the owner of it, who was the party to be affected by such revival, had, as the court adjudged, taken his mortgage with notice that such canceled mortgage was still a subsisting lien upon the property. Chancellor Pennington there says: " It is settled in this court, that the cancellation of a mortgage of record, is only *prima facie* evidence of its discharge, and leaves it open to the party making such allegation, to prove that it was made by accident, mistake, or fraud. On such proof being made, the mortgage will be established even against subsequent mortgagees without notice." And he cites *Miller et al.* v. *Wack et al*, *Saxt.* 214; *Lilly* v. *Quick*, 1 *Green's C. R.* 97.

The question whether a mortgage canceled of record by mistake or fraud, would be established as against a subsequent mortgagee, who took his mortgage *after* such cancellation of record, and in reliance upon the record, and having no notice that such cancellation had been improperly made, was not presented in the case of *The Trenton Banking Co.* v. *Woodruff*, and it was not necessary in that case to decide it; and I do not understand the Chancellor as intending to decide it. Nor do I find that it was so held in the two cases to which he so refers. So far as I have examined, that question has never been decided in our courts. There are decisions in other states which decide it, or have a bearing upon it.

In *Robinson et al.* v. *Sampson*, 23 *Me.* 388, a mortgage had been canceled of record by mistake. There was a mortgage subsequent to it, which, however, had been taken *before* such cancellation. The judge, in deciding that case, refers to the opinion of Chancellor Pennington, in *Trenton Banking Co.* v. *Woodruff*, and quotes from it the same paragraph

herein above quoted, and there says : "To this position we cannot hesitate to yield our assent, *if the subsequent mortga-gee, as in this case, becomes such, anterior to the cancellation.*" From which I think it is fairly to be inferred, that if the subsequent mortgage had been taken *subsequent* to the cancellation of record, that the canceled mortgage ought not, in the opinion of the learned judge, to be allowed priority over it.

In *Barnes* v. *Camack et al.,* 1 *Barb. S. C. R.* 392, there were two mortgages. The second was taken while the first was upon record. The first was afterwards canceled through fraudulent representations, in which, however, the holder of the second had no part. The cancellation was declared void. And the court, in their opinion, said : " The principle which runs through all cases of this description is, that when the legal rights of the parties have been changed by mistake, equity restores them to their former condition, when it can be done without interfering with any new rights, acquired on the faith and strength of the altered condition of the legal rights, and without doing any injustice to other persons."

This implies that if, as in the case now under considera-tion, new rights had been acquired upon the faith of the can-cellation of the mortgage, the mortgage would not be revived and established, to the prejudice of such rights.

In *Vallé's adm'x* v. *American Iron Mountain Co.,* 27 *Missouri* 455, the case was on a petition to foreclose a mort-gage which had been canceled of record. The defendants had purchased the mortgaged premises of the mortgagor, while the mortgage stood canceled of record. The plaintiffs alleged that the cancellation was fraudulent. The court de-cided that the plaintiffs might prove that fact, if they could, but that in order to affect the defendants as *bona fide* pur-chasers, it must be shown also, that at the time of the pur-chase, they knew of the fraud. The judge says : " Of course the fraud must be brought home to the defendants ; if they purchased without knowledge of the fraud, the entry (mean-ing the entry of the cancellation), is conclusive as to them."

The case of *Ely* v. *Schofield*, 35 *Barb. S. C. R.* 330, was for the foreclosure of a mortgage.

. It appeared that a mortgage had been given upon certain premises, and duly recorded, and that it was afterwards canceled of record by mistake, and without being paid. While it stood canceled of record, the mortgagor sold the premises ; the purchaser, having first caused a search of the records to be made by the clerk, and received from him a certificate, in which the mortgage was noted as having been duly discharged. After the purchaser had taken his deed, and *had had it recorded*, the owner of the mortgage gave him notice that it had been canceled by mistake, and that he claimed that it was still a subsisting lien upon the premises. It was decided by the court, that the purchaser was entitled to hold the premises free from the lien of the mortgage. But that, if such notice had been given to the purchaser *before* he had put his deed upon record, then, under the peculiar provisions of the statute of that state, relating to such matters, the mortgage would have been a lien upon the lands, in the hands of the purchaser.

In *Executors of Swartz* v. *Leist*, 13 *Critchfield (Ohio) Rep.* 419, a mortgage was executed to Mr. Little to secure certain promissory notes, held by different persons. Little held one of them, and afterwards transferred it to Swartz, testator of plaintiffs. After this, and while that note was yet unpaid, Little canceled the mortgage of record ; and while it stood so canceled, the mortgagor sold the mortgaged premises to Leist, the defendant, who was a *bona fide* purchaser, and had no notice that the cancellation was fraudulent. The court held, that the cancellation was a fraud upon the rights of the holder of the note ; but yet, that as against the *bona fide* purchaser, the mortgage could not be declared a lien upon the lands. The court said, among other things : " But the parties here are not equally faultless, and do not stand *in equali jure*. Swartz negligently, or confidingly, permitted Little, the mortgagee, to retain the legal title conveyed by the mortgage, and the power of control over it. Little thus

had the legal power, and ostensibly a perfect right, to discharge and release it. Leist, the purchaser, having no reason to suspect fraud, was justified in regarding the release, legally made by one who was ostensibly the proper party, as an effectual discharge of the lien. *And as between these parties, he who unwisely reposed confidence in Little, and gave him the power to defraud, should suffer the consequences.*"

The application of these decisions to the case under consideration, is obvious, and I need not remark upon them.

I am of opinion that the complainant is not entitled to the relief prayed for, and that the bill of complaint should be dismissed; and I respectfully advise the Chancellor to make a decree accordingly.*

* Decree reversed, 4 *C. E. Gr.* 488.